UNITED STATES DISTRICT COURT - NH

THE UNITED STATES OF AMERICA

v.

OLUWASEUN ADEKOYA

1:13-cr-98-01-JL

SENTENCING MEMORANDUM

Oluwaseun Adekoya, through undersigned counsel, respectfully offers his Sentencing Memorandum for consideration by the government, probation and Court.

In support, it is stated:

1. On May 14, 2014, the grand jury brought a second superseding two-count indictment alleging bank fraud and conspiracy to commit bank fraud.  On July 8, 2014, the jury trial began, and on October 16, 2014, the jury found Mr. Adekoya guilty of both counts of the second superseding indictment.

2. Mr. Adekoya has been detained as a result of this case, since his arrest at his home in New Jersey on October 3, 2013.

3. Prior to Mr. Adekoya's trial, his four co-defendants pled guilty to participating in the same bank fraud and conspiracy, but under a different docket number, and before a different judge. United States v. Adebayo Adegbesan et al, 1:13-cr-01110-PB.  Following Adekoya's trial, all were sentenced to time served (all had been released at the time of arraignment), and supervised release.  PSR at p. 4, §11.

4. Mr. Adekoya respectfully requests that this Court take judicial notice of its records in the Adebayo Adegbesan case and allow all pleadings and docket entries, including the PSRs in

those cases, to be part of the record in this case for purposes of appeal.

5. Following the guilty verdicts in this case, this Court scheduled a sentencing hearing for October 22, 2014, and then rescheduled it on defense counsel's request, to November 14, 2014.

6. On October 31, 2014, USPO Janis Benard filed the final Pre-Sentence Investigation Report (hereinafter, PSR), which includes a copy of Mr. Adekoya's objections to a previous draft of the PSR. As further discussed herein, USPO Benard also filed an Addendum to the PSR on October 31, 2014 (hereinafter, Addendum), which addresses Mr. Adekoya's objections, identifying three of the objections as "unresolved."

## The Law Governing Sentencing

7. Because the sentencing guidelines are advisory in nature, United States v. Booker, 543 U.S. 220 (2005), this Court must carefully consider all of the factors listed in 18 U.S.C. § 3553(a) when exercising its sentencing discretion. Gall v. United States, 552 U.S. 38 (2007); Booker, 543 U.S. at 262.

8. Section 3553(a) directs sentencing courts to consider a number of factors, inter alia:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

9. The sentencing court's ultimate responsibility is to impose a sentence that is "sufficient, but not greater than necessary," to achieve the purposes which underlying the sentencing statute. 18 U.S.C. § 3553(a).

## Application of the advisory United States Sentencing Guidelines

10. Mr. Adekoya agrees with the assessment of the PSR that the advisory guideline range is

determined pursuant to USSG §2B1.1, which calls for a base offense level of 7, and then a determination of "loss" to assess how many additional levels should be added. Mr. Adekoya further agrees that loss is the greater of actual loss or intended loss, pursuant to USSG §2B1.1, comment. (n.3). Mr. Adekoya further agrees that there is no actual loss in this case, and that pursuant to USSG §2B1.1, comment, n.3(C), the Court "need only make a reasonable estimate of the [intended] loss." See PSR at 8, §22.

11. As further discussed below, however, Mr. Adekoya does not agree with the PSR's determination of intended loss ($960,000.00, which results in a 14-level increase) and as further discussed below, does not agree that it is appropriate to use a different methodology for determining intended loss, then used with the co-defendants at their sentencing hearings. See Addendum to PSR.

12. Mr. Adekoya, as further discussed below, does not agree that he should receive a four-level aggravating role adjustment, when co-defendant Adebayo Adegbesan received only a three-level aggravating role adjustment. See PSR at 9, §23.

13. The PSR assesses three criminal history points. Accordingly, Mr. Adekoya is a criminal history category II for purpose of the advisory guidelines.

**Circumstances of the Defendant**

14. Mr. Adekoya cooperated in the process of drafting the PSR, met with USPO Benard to provide information and input, and agrees with the history provided in the PSR at pgs. 12-15, §§43-51, and 53-58. Undersigned counsel has also met personally with each of Mr. Adekoya's parents and received a similar history from them, with additional facts and insights that are discussed here.

15. Mr. Adekoya comes from a family of highly-educated professionals, with the exception of his

3

father, who is a cab-driver.  When they lived in Nigeria, according to the history provided by Adekoya's mother Victoria Adekoya to undersigned counsel, Victoria Adekoya worked as a school principal.  She was very proud of her work there as a school principal.

16. However, when she immigrated to Brooklyn, New York, Victoria Adekoya decided not to continue working in public education, in part because of licensing difficulties, but also because she saw a very different educational environment in the public schools in Brooklyn, which she viewed as lacking sufficient controls over student behavior.  Instead, she started a new career, becoming a registered nurse.

17. Adekoya's father Adebola Adekoya works as a cab driver.  He was granted political asylum from Nigeria at a time of political and civil unrest, and came to Brooklyn, alone, in 1994.  At the time, Adekoya would have been about 9 years old.  He and the rest of his family did not join his father in the United States until about 6 years later.  Thus, Adekoya would have come to the United States around the age of 15, right around the beginning of high school.

18. Adekoya's siblings, by contrast, would have completed their secondary education and perhaps college-level coursework in Nigeria – and had matured to adulthood - prior to immigrating to the United States.  His older brother would have been about 26 years old, and his sister about 21 years old, at the time they immigrated to this country.  Their decisions to immigrate to a new land, would have been adult decisions.

19. Thus, counsel would contend that Adekoya is the sibling who would have experienced the greatest upheaval, immigrating from Lagos, Nigeria to Brooklyn, NY, as a young teenager, following his mother, in order to reunite his family.  This could potentially shed light on why the Adekoya's youngest son has had difficulty adjusting to American life, and has not had the personal and professional success of his older siblings, Koyode Adekoya (married with four

4

children, and a physician), and Misitura Ejiowe (married, three children, an accountant).

20. Both of Adekoya's parents expressed to counsel that they disapproved of many of the street-based or school-based influences on Oluwaseun following his arrival in Brooklyn. They felt that Oluwaseun became exposed to bad values and poor standards of conduct, as compared to his life in private schools in Nigeria. They strived to move away from these influences, finally moving to Sewaren, New Jersey, but that was seven years later, and by that time, Oluwaseun was about 22 years old.

21. The PSR was not able to confirm (or dispute) Mr. Adekoya's statements about his enrollment in several different college programs following graduation from high school. However, undersigned counsel, having spent much time with Mr. Adekoya and having reviewed many written submissions from Mr. Adekoya, has no doubt that he has the aptitude, intellectual ability and internal drive (if directed properly) to complete a rigorous program of college coursework. Indeed, he is a significantly better writer and researcher, than a number of the undergraduate students that undersigned counsel taught when working as an adjunct professor at two New Hampshire based colleges.

22. Undersigned counsel found an interesting contradiction in speaking with Mr. Adekoya's parents and trying to gain insight regarding Mr. Adekoya's choices over the last several years (Adekoya's past criminal conduct, detailed in the PSR, arises out of several episodes, first in 2008 in New York, and then in 2011 and 2013 in New Jersey). PSR, pg. 10, §40. Undersigned counsel found both father and mother to be rather stern individuals, who do not approve of what they perceive to be a permissive attitude towards drug use, criminal behavior, disrespect towards authority figures, displayed by certain American youth. They moved from Brooklyn, New York to Sewaren, New Jersey in an attempt to move away from those influences. Yet,

mother also explained to counsel that their home country culture makes the family sacrosanct, such that a parent could not discontinue support such as providing a home, food, clothing, to an adult child who has not become employed and has made poor choices.

## **Advisory Guidelines – Intended Loss Calculation**

23. First, Adekoya contends that there is no rational basis to use a different methodology to compute his intended loss, than the methodology used with respect to his co-defendants, placing particular focus on co-defendant Adebayo Adegbesan. Adegbesan and his co-defendants were convicted of bank fraud, arising out of the same set of facts as Adekoya's bank fraud conviction. The co-defendant Adegbesan is most similarly situated to Adekoya, because he recruited the participants for the operation and he managed the operation on the ground. In Atlanta, Adegbesan recruited two of the other co-defendants, Banks and Harris, and then Harris recruited his cousin, Brown. Adegbesan directed Banks to purchase air tickets, from Atlanta to New Hampshire. Adegbesan directed Banks to rent cars upon arrival in New Hampshire. No witness claimed that Adekoya advanced any moneys to fund this operation.

24. Further, it was Adegbesan who picked up the 200 plastic cards at the Hilton Garden Inn, Manchester. It was Adegbesan who divvied up these cards, and the lists of ATMs, between the four men who intended to travel in two rental cars from ATM to ATM. Adegbesan kept possession of 120 plastic cards in his vehicle. To counsel's recollection, none of the testifying co-defendants claimed at trial that they were in direct communication with Adekoya prior to flying from Atlanta to Manchester, New Hampshire, and after arrival, all of the testifying co-defendants agreed that only Adegbesan communicated with a third party, which the jury found to be Adekoya. Accordingly, Adegbesan is the most culpable of the four co-defendants who traveled to New Hampshire to actually execute this scheme.

6

25. Against this backdrop, the United States Probation Office recommended that this Court use the following methodology to compute Adegbesan's intended loss: 200 cards times $400 per ATM withdrawal, for a total of $80,000.00. See Addendum to PSR at 1, §3. For Adekoya, the PSR advocates a different methodology, multiplying 200 cards times $400 per ATM withdrawal times 15 ATMs, for a total of $960,000.00. This discrepancy results in a twelve-fold increase in Adekoya's intended loss, even though Adekoya was hundreds of miles away and could have only received whatever funds that his co-defendants actually withdrew (if it was not a sting operation).

26. Under U.S.S.G. 2B1.1(b)(E), an intended loss of $80,000.00 would add eight levels to the base offense level of 7, far short of the 14 level increase that the PSR recommends for Adekoya.

27. The Addendum to the PSR provides several justifications for treating Adekoya differently than Adegbesan with respect to computation of intended loss. First, it states that Adekoya was "involved in the inception of the operation." Addendum to PSR, at pgs. 1-2, §4. However, it was undisputed at trial that the person who conceived of this operation was not Adekoya but Special Agent Matt O'Neill, who devised it as a means of luring Adekoya to New Hampshire for arrest on an existing warrant arising out of other indicted conduct that the government later dismissed. (The original September 25, 2013 indictment, replaced by Superseding Indictment, alleged wire fraud and attempted access device fraud, arising out of conduct alleged to have occurred between April 27, 2012 and April 3, 2013).

28. In essence, according to the trial evidence, Special Agent O'Neill devised a complex scheme, recruited Adekoya to execute the scheme, and then Adekoya recruited Adegbesan to execute the scheme. Adekoya had scarcely more role in devising the details of this scheme, than did Adegbesan. And Adegbesan had a far greater role in executing the scheme, as detailed above.

7

Thus, to the extent that Adekoya was "involved in the inception of the operation," Adegbesan was as well, and this factor either does not distinguish the two in terms of culpability, or does not distinguish them enough to justify an over 1000 percent difference in the intended loss culpability attributable to each.

29. Second, the Addendum to the PSR explains the discrepancy by stating that Adekoya was "fully aware of the extent of the operation," whereas the co-defendants had a "limited knowledge and understanding of the scope of the operation." Addendum to PSR, at pgs. 1-2, §4. However, the facts of the case, as detailed in the PSR, show that the scope of the operation was determined solely by Special Agent O'Neill, who created the plastic cards, created the lists of ATMs, created the notes with phony PINs, and left these in a package at the Hilton Garden Inn. Adekoya had no role in creating the cards, identifying ATMs, making lists of target ATMs, or choosing PINs.

30. When Adegbesan picked up this package, opened it, and distributed the cards and ATM lists among his henchmen, he gained a knowledge and understanding of the scope of the operation at least as great as held by Adekoya, and arguably greater, since Adekoya had never seen that package and had no way of knowing what it would contain.

31. Further, there was no way for Adekoya to determine the scope of the scheme, much less expand it. No one has ever suggested that Adekoya had the means to produce plastic cards that could work in ATMs. No one has ever suggested that Adekoya had knowledge of any account information at any bank identified in the materials in the package. No one has ever suggested that Adekoya had the ability to manipulate PIN codes, as did the government agents involved in this sting operation. In short, Adekoya, no less than Adegbesan, was wholly dependent on the actions of government agents to determine the "scope" of this scheme, and had no ability to

8

expand its scope.

32. Further, the PSR explains that in his Mirandized statement, Adegbesan acknowledged that he knew he would be picking up a package that contained 200 plastic cards, and that Adekoya told him that they could "withdraw up to $100,000.00 from the ATMs." PSR, pg. 6, §17. It is unclear from his Mirandized statement whether he meant $100,000.00 total, or $100,000.00 from each ATM, but neither meaning supports treating the codefendants differently as to intended loss, because either way, Adegbesan's Mirandized statement demonstrates that Adekoya and Adegbesan had a shared understanding as to the scope of the operation.

33. Further, the Mirandized statements of Brown and Harris, discussed in the PSR, indicate that both understood that they were to travel to all of the ATMs on the list, not just one ATM. PSR, pgs. 7-8, §21, 22. Thus, all of the co-defendants – particularly Adegbesan, who directed the others – had the same understanding as Adekoya, as to the scope and extent of the operation. In fact, it was only the four co-defendants in New Hampshire, who could determine the scope and extent, by deciding how many ATMs to visit, how many cards to use in each ATM, and how much to withdraw in each transaction. Thus, the only person of the five, who could <u>not</u> determine the scope and extent of the operation, was Adekoya.

34. Finally, the PSR, in its recommendation for intended loss, points to the fact that Adekoya sent a text message to Adegbesan's brother after the fact, "baba this was supposed to be a 900K job." However, the person who sent that text message was merely parroting a September 30, 2013 email from the undercover officer impersonating "Wang Sang," to "Shawn Carter", the email associated with Adekoya, which states: "Last time we had 183 pins and got 700000 usd. Hope to get 850-900000 usd." It is irrational to rely on an after-the-fact message of frustration from Adekoya's phone, which parroted a message of (phony) wishful thinking expressed by an

9

undercover officer, to justify a twelve-fold increase in the intended loss calculation over that of Adegbesan, when only Adegbesan and his soldiers on the ground could determine the amount of actual losses, by deciding how many ATMS to visit, etc (if it wasn't a sting operation).

35. Another flaw in the proposed methodology for calculating intended loss in this case is that this Court should not multiply each single card times 12 ATMs. A person cannot take a single ATM card, and go to a series of ATMS, and withdraw the daily maximum from each ATM, all in one day. The daily maximum is the daily maximum. The co-defendants possessed plastic cards for only one day, and there was no evidence at trial from which a reasonable person could conclude that the co-defendants intended to remain in New Hampshire for 12 days (in order to make repeat visits to 12 ATMs). Thus, the intended loss value should be, at most, the daily limit times 200 cards, which would be $80,000.00. United States v. Lewis, 312 Fed. Appx. 515 (4th Cir. 2008)(Court "conclude[s] that the district court did not clearly err in using the daily credit limit multiplied by the number of days Lewis possessed the debit card as an estimate of intended loss.").

36. Adegbesan's intended loss calculation did not include the "times 12 ATMs" part of the calculation. There is no reason to treat Adegbesan and Adekoya differently in this regard, particularly when only Adegbesan, the possessor of the cards, was truly in control of how many ATMs he might visit and how many days he might remain in New Hampshire.

37. For all of these reasons, it is arbitrary to use a different methodology for assessing the intended loss against the co-defendants, particularly with respect to co-defendant Adegbesan. The guidelines were promulgated for the purpose of avoiding arbitrary sentencing disparities between people who commit similar crimes, but that purpose can only be achieved if the guidelines are interpreted in a consistent fashion. Accordingly, this Court should set the

intended loss, at most, at $80,000.00 as the Court did in Adegbesan's sentencing hearing, for a eight-level increase of the base offense level, resulting in offense level 15.

## Departure for Sentence Disparity

38. In the alternative, Adekoya requests that the draft PSR consider a departure for sentence disparity. See, e.g., United States v. Jones, 551 F.3d 19, 23-24 (1st Cir. 2008). Despite the fact that he was convicted of the same bank fraud, Mr. Adegbesan was sentenced by a different Judge, Judge Barbodoro. 18 U.S.C. § 3553(a) prompts sentencing courts to consider, among other factors, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." One of the core purposes of the development of the guidelines, is that "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." I Federal Sentencing Guidelines Manual at 2 (West Nov. 1, 2013). In order to further this core purpose, the United States District Court for New Hampshire should strive to apply consistent interpretations of the guidelines for co-defendants in the same case. Accordingly, Mr. Adekoya requests that if this Court applies a 14-level increase for intended loss, it should then grant a 6-level downward departure, to avoid unwarranted sentence disparity.

## No Prospects for Success

39. The intended loss calculation should be downgraded because there were no prospects for success. United States v. Jones, 551 F.3d 19, 24 (1st Cir. 2008)("As this court has previously stated, we will uphold an intended loss determination 'where there is good evidence of actual intent and some prospect of success.'")(quoting United States v. Robbio, 186 F.3d 37, 44 (1st Cir.), *cert. denied,* 528 U.S. 1056 (1999)). Because the plastic cards were nothing more than

plastic cards, there were no prospects for success. Further, even going by the intentions of the co-defendants, there were no prospects for success of the scheme as envisioned in the PSR - running 200 cards, through 12 different ATM machines, over the course of 12 days, with only 4 men and 2 vehicles to accomplish these goals.

### **Partially Completed Offense – Three Level Reduction**

40. The draft PSR should apply a three-level reduction for "partially completed offense" based on Application Note 18 to 2B1.1. Application Note 18 states:

    In the case of a partially completed offense (e.g., an offense involving a completed theft or fraud that is part of a larger, attempted theft or fraud), the offense level is to be determined in accordance with the provisions of §2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both. See Application Note 4 of the Commentary to §2X1.1.

41. The referenced Application Note states:

    In certain cases, the participants may have completed (or have been about to complete but for apprehension or interruption) all of the acts necessary for the successful completion of part, but not all, of the intended offense. In such cases, the offense level for the count (or group of closely related multiple counts) is whichever of the following is greater: the offense level for the intended offense minus 3 levels (under §2X1.1(b)(1), (b)(2), or (b)(3)(A)), or the offense level for the part of the offense for which the necessary acts were completed (or about to be completed but for apprehension or interruption). For example, where the intended offense was the theft of $800,000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels, or the offense level for the theft of $30,000, whichever is greater.

42. Further, the Application Note continues:

    Background: In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted. Sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense. Under such circumstances, a reduction of 3 levels is provided under §2X1.1(b)(1) or (2).

43. In the present case, at the point of interruption by federal agents, the co-conspirators were far from having completed the acts necessary for the substantive offense as defined in this PSR,

12

which effectively defines the substantive offense as defrauding twelve banks out of nearly a million dollars.  PSR at p. 8, §22. Rather, these co-defendants had only made it to the first ATM on the list. Thus, this Court should reduce the offense level by three levels.

## **Departure – Economic Reality Doctrine**

44. Further, Adekoya requests that this Court grant a departure based on the economic reality doctrine.  According to the United States Sentencing Commission the sentencing judge may consider impossibility of success as a basis for a downward departure:

> C. No "Economic Reality Principle" Under the Guidelines
>
> Prior to the November 2001 amendments to the sentencing guidelines, some courts noted an exception to the use of intended loss when a defendant had devised a scheme obviously doomed to fail which caused little or no economic loss. Under the revised definition of intended loss, this exception is no longer available. As noted above, the revised loss definition instructs courts to include harm that would have been "impossible or unlikely to occur." <u>It is, of course, still possible that the sentencing judge might consider these same factors as a basis for a downward departure</u>. For example, in United States v. McBride, [362 F.3d 360, 375 (6th Cir. 2004)], the court ruled that impossible losses are to be included in the loss figure, but remanded the case for the sentencing judge to consider a departure based on 'economic reality.'

Office of General Counsel U.S. Sentencing Commission, Loss Primer (§2B1.1(b)(1)), (March 2013), p. 8 (Emphasis added).

45. "The underlying theory behind this principle is that where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination from the [§2B1.1] table." <u>United States v. McBride</u>, 362 F.3d 360, 375 (6th Cir. 2004).  In <u>McBride</u>, a case subsequent to the 2001 amendment, the court held:

> We conclude that the impossibility that McBride's scheme would succeed and the gross disparity between the actual loss and the intended loss demonstrate that there is a significant risk that "the offense level determined under this guideline substantially overstates the seriousness of the offense ... [and] a downward departure may be warranted." U.S. Sentencing Guidelines Manual § 2B1.1, cmt.18(C); see also United States v. Coffman, 94

    F.3d 330, 336–337 (7th Cir.1996) (applying the economic reality principle in considering a downward departure under § 2B1.1).

McBride, 362 F.3d at 376; *see also* United States v. Stockheimer, 157 F.3d 1082, 1090 (7th Cir. 1998); United States v. Downs, 123 F.3d 637, 644 (7th Cir.1997) ("fraud sentences should be grounded in economic reality and based on the actual risks created by defendants"); United States v. Coffman, 94 F.3d 330, 336-37 (7th Cir.1996)(" it seems plain to us that the place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss"); United States v. Studevent, 116 F.3d 1559, 1562-63 (D.C. Cir.1997)( "("[T]he place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss."); U.S. Sentencing Guidelines Manual, Application note 20(c) to§2B1.1.

46. Similarly, here the impossibility that any of these codefendants would succeed, and the gross disparity between the actual loss (zero) and the purported intended loss in the amount of $960,000, demonstrate that there is a significant risk that the offense level determined under the guideline substantially overstates the seriousness of the offense, as it relates to Adekoya.

47. It is noteworthy that McBride refers to the situation where a defendant "devises an ambitious scheme obviously doomed to fail," whereas here, Mr. Adekoya did not even devise a scheme. Instead, a fictional scheme was laid out for him by a government agent. Thus, the proposed intended loss figure substantially overstates the seriousness of the offense.

### Departure - Sentencing Factor Manipulation

48. Further, there should be identified a possible departure for sentencing factor manipulation. See, e.g., West v. United States, 631 F.3d 563, 570 (1st. Cir. 2011). As discussed above, the PSR justifies an intended loss figure of $960,000.00, in part, by referencing a text message from

14

Adekoya's cell phone to Ademola Adegbesan's cell phone, "Baba this was going to be a 900k job." PSR at p.6, §15 and p. 8-9, §22. However, this text message simply parrots a September 30, 2013 email from the undercover officer impersonating "Wang Sang," to "Shawn Carter", the email associated with Adekoya, which states: "Last time we had 183 pins and got 700000 usd. Hope to get 850-900000 usd."

49. Thus the originator of the so-called "intended loss" of $900,000.00 is the undercover agent, who had motive to artificially inflate the figure in order to entice Mr. Adekoya to come to NH, and also to influence the sentencing range should he actually travel to NH and be apprehended. He had motive to influence the sentencing range, because a higher sentencing range tends to provide greater incentive to plead guilty.

50. Of course, the contents of this email are a complete charade, totally fictional. There was no "last time." There was no crime involving 183 pins and reaped $700,000.00. There was no "[h]ope," on the part of the author of the email, of getting as much as $900,000.00. All of this was merely part of an effort, according to the undercover officer's testimony at trial, to lure Mr. Adekoya to New Hampshire so he could be arrested on a warrant already in existence.

51. The "Commission developed [the] guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system." Guidelines Manual, supra, at p.5. To propel Mr. Adekoya to a far higher guideline range, based solely upon an email written by a government agent who had motive to grossly inflate a number in an effort to achieve his objectives, so that Adekoya is placed at a far greater guideline sentencing range than his co-defendants, does not further any of these objectives. Rather, it will result in a non-uniform, inequitable, disproportional, and therefore ineffective sentencing system.

**Aggravating Role Adjustment**

52. According to his Sentencing Memorandum, the PSR in Adegbesan's case recommended a three-level aggravating role adjustment, for being a manager or supervisor (but not an organizer or leader). Doc. # 83, Sentencing Memorandum, at p. 4, *United States v. Adegbesan et al*, 1:13-cr-01110-PB. Adekoya's PSR, however, recommends a 4-level aggravating role adjustment. PSR p.9, §23. This is unwarranted. As discussed above, Adegbesan had extensive involvement in this case and a much more active role than Adekoya, as he actually recruited the other co-defendants, traveled to New Hampshire, collected the plastic cards from the hotel, distributed them among the co-defendants, distributed the instructions and ATM lists and PINs to the co-defendants, and was the passenger in the car with Banks when Banks attempted to place a plastic card inside an ATM.

53. While the jury can be assumed to have determined that Adekoya gave instructions to Adegbesan, these instructions mere the simple relaying of instructions given by the undercover officer. Mr. Adekoya notes that he is only said to have recruited one person; if Adegbesan had not recruited three more people, then there would not be five people total, and 3B1.1 would not apply at all. For all these reasons, there is no basis to assign a more culpable aggravating role adjustment to Adekoya, as opposed to Adegbesan.

**Variance to Prevent Unfairly Disporportional Sentencing among Co-Defendants**

54. All four of the co-defendants, at sentencing, received "time served" and supervised release. None of them had been detained prior to trial or after change of plea hearing. Thus, none of them served any time in prison for participation in the same offense that Adekoya was convicted of.

55. The co-defendant who is most similar to Adekoya is Adegbesan. As discussed throughout

this Memorandum, Adegbesan had a very substantial role in this operation, recruiting other participants, traveling from Georgia to New Hampshire, renting cars, picking up the package from the Hilton Garden Inn, distributing the plastic cards, and directing the co-defendants on the ground as they proceed to attempt to use the cards at an ATM. Adegbesan did not testify against Adekoya at trial.

56. Adegbesan received time served and supervised release. The PSR recommends that this Court find that Adegbesan fall within the following sentencing range: 63-78 months. Mr. Adekoya did not testify at his trial. He simply put the government to its proof. It would be grossly disproportionate, to sentence Adekoya within the proposed sentencing range, when Adegbesan received no prison time at all. Accordingly, to the extent that this Court did not rectify sentencing disparity by granting one or more of the departures described above, this Court should grant a substantial variance in order to prevent unwarranted and unjust sentencing disparities among similarly situated co-defendants in this case.

                                                               Respectfully submitted,

                                                               */s Theodore Lothstein*
                                                               Theodore Lothstein
                                                               N.H. Bar No. 10562
                                                               Lothstein Guerriero, PLLC
                                                               3 N. Spring Street, Suite 101
                                                              Concord, NH 03301
                                                             603-513-1919

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing Motion has been sent by electronic mail on November 4, 2014 to Arnold Huftalen, Esq., Assistant United States Attorney, and sent via first class mail to Mr. Adekoya.

                                                                */s Theodore Lothstein*
                                                               Theodore Lothstein